IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2026 Session

## STATE OF TENNESSEE v. RICHARD LAWRENCE CANADA

**Appeal from the Circuit Court for Rutherford County**
**No. 86965    Howard W. Wilson, Chancellor**

_____

### No. M2025-00397-CCA-R3-CD

_____

Defendant, Richard Lawrence Canada, was convicted by a Rutherford County jury of eight counts of rape.[1]  The trial court sentenced Defendant to an effective eleven-year sentence to be served in confinement.  Defendant appeals, arguing that the evidence is insufficient to support his convictions and that his sentence is excessive.  Upon our review of the entire record, the briefs and arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Patrick McNally, Nashville, Tennessee (on appeal) and Joshua T. Crain, Murfreesboro, Tennessee (at trial), for the appellant, Richard Lawrence Canada.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sarah Davis and Dana Minor, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Defendant was also charged with two counts of sexual exploitation of a minor.  On Defendant's motion, those counts were severed because they stemmed from "images that were located on an electronic device seized from the Defendant" and were not "part of the alleged criminal conduct of counts one through eight of the indictment."

# OPINION

## Factual and Procedural Background

The victim's[2] mother, C.L., testified that she purchased their home in Murfreesboro at an auction in 2001 while the family was living in Florida. At that time, she met Defendant and his wife, Martha Canada, who lived next door. C.L. visited the house many times to "look after it" and check on her tenants, and she occasionally spoke with Mrs. Canada while there. In 2013, after C.L.'s husband had a stroke, he was admitted to the Tennessee State Veteran's Home, and C.L. moved into the house in Murfreesboro with her son and the victim. C.L.'s husband later passed away.

C.L. testified that she and Mrs. Canada took care of each other's plants and pets while on vacation, and Mrs. Canada eventually began paying the victim to take care of her dog and plants when gone. They always spoke with Mrs. Canada to set this up. C.L. testified that Mrs. Canada occasionally invited her over for supper and had brought her something to eat when she was ill. C.L. testified that she and Mrs. Canada were "just neighbors," and C.L. said she did not have a friendship with Defendant. She never had any reason to think that Defendant had a romantic interest in the victim or that the victim had an interest in him.

On July 25, 2021, C.L. received three missed calls from an unfamiliar number at 7:30 p.m., 7:32 p.m., and 7:34 p.m. She called the number back, and Defendant answered. C.L. testified that Defendant "sounded desperate" and wanted to talk with the victim who was twenty years old at the time. "He said he was taking a class, and he had to have an interview with a college-age student. He had to ask questions concerning whatever he was doing with a class." C.L. gave her phone to the victim but did not listen to the conversation. The victim then said that she needed to go to Defendant's house to answer some questions. C.L. told the victim that Mrs. Canada was not home because she was out of town visiting grandchildren and that the victim could answer the questions and "then come right back home." The victim returned approximately thirty-five to forty minutes later and then left to spend the night at her older sister's house.

The victim testified that in addition to house sitting for Defendant and Mrs. Canada when they were away, she and her brother went to the house once or twice to work on a school project when they were in high school. When asked how often she visited the Canada's residence, the victim replied, "Not, like, super frequently. But I would go, maybe, like - - maybe, like, once a month or every two or three months just to

---

[2] It is the policy of the court to protect the identity of victims of sexual offenses by using their initials. For the same reason, we also refer to the victim's family members by initials.

see, like, [Mrs. Canada] or something." The victim said she was normally with Mrs. Canada, and C.L. sometimes accompanied her to the residence. She said that the main reason for going to the house was for Mrs. Canada to give her instructions on taking care of the dog and plants. The victim had never been alone in the house with Defendant.

On July 25, 2021, the victim arrived home from work around 4:30 to 5:00 p.m., cooked dinner for C.L., and went to her room to watch television. At some point, C.L. brought the phone to her room and said that Defendant needed to talk to her about a questionnaire for a class project and that he needed someone to help him because "this other girl had dropped out[.]" The victim said that she had never previously spoken to Defendant on the phone, and she did not have his phone number. Defendant told her that she needed to change clothes for the project and wear "kind of, like, a bathing suit bottom because he was going to touch my knees and elbows for example." She said that he also mentioned a sports bra. Defendant did not say anything about a massage at that point.

The victim testified that she wore a "sports bra and bikini bottoms, a t-shirt, and shorts, and [her] shoes" to Defendant's house. When asked why she chose to wear a bathing suit, the victim replied, "Because I knew that underwear was not appropriate to wear. And he said he needed to touch my body for the project. And I assumed if he was going to, I didn't want to wear my under-attire." The victim testified that Defendant seemed like the matter was urgent, and she left her house around 7:30 to 7:40 p.m. She thought Defendant's request was "strange, but since he was my neighbor, I didn't think much of it." The victim testified that she trusted Defendant. Before the victim left the house, C.L. asked her to change shorts because "they were, like - - kind of my pajama shorts. So I put on some athletic shorts." The victim clarified that when she left the house, she was wearing an oversized t-shirt, sports bra, and athletic shorts with a bathing suit bottom underneath.

When the victim arrived at Defendant's house, he was sitting outside on the steps and appeared to be writing on a notepad. He then stood up, walked her inside, and shut the door. The victim sat down on the couch in the living room, and Defendant sat down in a chair across the room from her. There was a "pallet" in the floor with a "bunch of" sheets, pillows, a camera on a tripod in the pillows facing the pallet, and an anatomy book. The room was dimly lit with candles. The victim testified that Defendant began asking her questions and writing in the notepad. He asked if she had previously had a massage, and she said no. He also asked about her hobbies and any previous injuries. The victim noted that the questions seemed normal at that point. She felt uncomfortable but did not do anything because she trusted Defendant. Defendant then instructed the victim to get undressed but to leave on her undergarments and lay down on the pallet under a sheet, and he left the room. The victim expected Defendant to touch her arms

- 3 -

and legs, which were visible. She placed her phone underneath the pillow because she felt uncomfortable. Defendant told her that the session would be recorded.

The victim testified that Defendant walked back into the room and began rubbing her feet with oil. He then worked his way up her calf and to her thigh. The victim noted that the camera was on at one point because she remembered seeing the "flash in the background" that reflected on the walls. She said that Defendant worked his way up to her buttocks and was "touching right underneath. Right on the back of my thighs, right under my butt." The victim remembered "moving [her] arms down underneath the pillow, and putting them near the side of the hoops,[3] where my bikini bottoms were." She said that Defendant then removed her bikini bottom as she was holding on, "[s]o it was more forcefully." The victim testified that although she did not want Defendant to remove her bikini bottom, she did not object because she "kind of just laid there in shock."

The victim testified that Defendant began touching her buttocks and inside of her vagina. She noted that she was wearing a tampon and Defendant "went basically anywhere that my tampon wasn't." He asked her to remove the tampon, but she said no. The victim testified that she was "just, kind of, screaming on the inside." She did not say anything because she was still in shock and felt that she could not do anything to stop Defendant. She attempted to pull the sheet down at one point. The victim testified that Defendant then spread her legs apart and used a vibrator on both the inside and outside of her body. She never saw the vibrator but could hear and feel it. Defendant never asked whether he could touch her with his hand or the vibrator. Defendant then asked her to turn over. The victim said that she complied with Defendant's request because she was afraid that "something else would have happened." She said that Defendant continued touching her vagina with his hand and then with his mouth. The victim said that he was kind of, like, just licking" inside of her vagina and moaning. She was "in shock and really uncomfortable." The victim testified that Defendant told her to close her eyes and that he wanted her to "release." He also asked if she had "orgasmed before" and she said no.

The victim testified that the incident lasted thirty to forty-five minutes, and she did not want Defendant to do any of those things to her. She attempted to get him to stop touching her by making "small talk" and asking his wife's whereabouts. She also asked Defendant to touch her arm; however, he continued touching her intimate areas. The victim testified that Defendant eventually left the room, and she got dressed. He also left a business card on top of her clothes. She said that Defendant told her to let him know if she later had any pain or bruising and to drink plenty of water. The victim testified that

---

[3] The victim testified that her bikini bottom had hoops on each side near her hip bone.

- 4 -

Defendant made the entire incident seem like a massage and he never mentioned that there was anything sexual between them. She said that she "felt kind of violated" after the incident and did not feel like she just had a massage.

The victim did not tell her mother what happened when she got home because she was afraid her mother "was going to react and go over there." She then left to take care of her sister's dogs. On the way there, the victim called her friend, Abby Sanders. She knew Ms. Sanders had experience with massages and told Ms. Sanders about her experience. Ms. Sanders told her that massages usually do not involve the touching of intimate parts. The victim told Ms. Sanders that Defendant inappropriately touched her, and Ms. Sanders sent the victim the address to her boyfriend's apartment and told her to meet her there. The victim drove there and told Ms. Sanders and her boyfriend what happened. The victim then decided to report the incident to police, and Ms. Sanders' boyfriend drove her and Ms. Sanders to the police department where the victim spoke with a detective. The following day, the victim told her mother what happened and met with Detective Tiffany Host to give a statement. She showed Detective Host an unread text message she had received from Defendant prior to the incident. She did not know that Defendant had her phone number, and she had never received a previous text from him. Defendant had also sent her two direct messages on Instagram. The victim noticed the messages after meeting with Detective Host and sent screen shots of them to her. The first message was sent on Sunday, July 25, 2021, at 12:29 p.m. and the second was sent at 6:38 p.m. asking "could you come over now[.]"

The victim testified that she was aware that the incident was videotaped but she had not watched the video. She did not give Defendant permission to videotape her, and she did not give him permission to touch her with his hands, mouth, or the vibrator, and Defendant also did not ask for permission.

On cross-examination, the victim testified that she had never previously dealt directly with Defendant or been alone with him, and she primarily interacted with Mrs. Canada. She had spoken with Defendant outside of his home one time when she went with a friend to the Murfreesboro Athletic Club ("MAC") where Defendant was a manager. The victim testified that when she first spoke with Defendant on the day of the incident, he told her about a questionnaire, and he indicated that he wanted her to "change and he wanted to touch [her] body" but she did not recall him saying anything about a massage until she got to the house. She did not think it was odd that Defendant mentioned touching her elbows and knees; however, at some point she realized that Defendant could get to her knees and elbows with her wearing more than a bathing suit. The victim said, "I, basically, was like, if he's asking me to do this, and it's a project, then I don't see the problem if he's just touching my knees or my elbows." She further

testified, "I used to go over there and do projects when I was a kid when I was in school, so I figured it was going to be the same scenario."

The victim admitted that she was a "little uncomfortable" while initially sitting on the couch talking to Defendant and noted that the room was dimly lit. Defendant asked her a "bunch" of questions while they were sitting in the living room and told her that he was going to touch her and that she needed to undress but leave on the bathing suit. Defendant walked into the kitchen while she undressed and lay down on the pallet. The victim admitted there was nothing preventing her from leaving Defendant's house at that point and that Defendant was not aggressive and spoke in a normal tone. However, she said that she was in shock and felt that she could not get up and go to the front door to leave. The victim agreed that she had her phone and could have called for help.

The victim explained that she felt her bikini bottom was forcibly removed by Defendant because she was holding on to it. She said that her phone was underneath the pillow at that point, but she was afraid to use it because she thought Defendant would hurt her. When asked if Defendant indicated that he would harm her, the victim replied, "Not hurt me, but that that I wasn't able to leave kind of. That's how I felt." The victim also said she felt afraid because Defendant had "more authority" over her. She further testified, "He is older. And growing up, I was taught always to, like, when someone who is older than you tells you what to do, you listen to them." The victim agreed that she was also taught that there are certain places on her body that other people should not touch. She denied that Defendant told her to let him know if she wanted him to stop doing something or to do something different. The victim admitted she was aware that private areas were not usually included in a massage, but she called Ms. Sanders for clarification.

When asked on redirect examination about her reason for not leaving, the victim testified, "He was kind of over me. Like, not like on top of me, but like his body was shifted on top of me if that makes sense. He was leaning over me. So I felt as though I couldn't get up and leave."

Ms. Sanders testified that she and the victim had been friends for approximately eight years, and they were like sisters. On July 21, 2021, the victim called her screaming and crying and said, "I think I just got raped." She sent the victim the address of her boyfriend's apartment, and Ms. Sanders went outside to meet her when she arrived. Ms. Sanders testified that the victim ran to her shaking and crying, and the victim was "terrified." She said that the victim went inside the apartment and told Ms. Sanders and her boyfriend what had happened. Ms. Sanders described the victim's face as "white as a ghost," and said that the victim was "shaking her legs like she was nervous." Her hands were also shaking, and she looked down the entire time she was talking to Ms. Sanders

- 6 -

and her boyfriend. Ms. Sanders testified that her boyfriend suggested the victim go to the police, and he drove her and the victim to the Murfreesboro Police Department ("MPD"). After speaking to police, the victim went home with Ms. Sanders and spent the night there because the victim did not feel safe going back to her own home.

MPD Officer Jenna Petersen testified that she was working at the front desk of the police department lobby on July 25, 2021, when the victim and two others walked in shortly after 10:00 p.m. Officer Petersen noticed that they seemed frantic, and she asked if they had an emergency to which they replied, "yes." She took them to an interview room and noticed that the victim was "really nervous and shaking; upset; scared." Officer Petersen then took a report from the victim who said that she had been sexually assaulted by Defendant and that there might be a video of the incident. The case was then assigned to a detective.

MPD Detective Host of the Special Victims Unit testified that she was assigned to investigate the present case. She interviewed the victim on July 27, 2021, with C.L. present. The victim had prepared a written statement in advance and presented information from her phone of which Detective Host took screenshots. One text message from Defendant to the victim contained the following: "Just checking if I have the correct number. This is Rick." Detective Host also took some screenshots of missed calls from Defendant's home phone on C.L.'s phone. She collected items of clothing from the victim consisting of a black sports bra, a black bikini bottom, and black shorts.

Detective Host and other officers then executed a search warrant at Defendant's residence to look for the video camera, the vibrator, and other electronic media. They found the vibrator in the nightstand of the master bedroom but did not find the video camera at the residence. Defendant indicated that it was at the MAC and contained a SanDisk memory card. Officers recovered Defendant's cell phone, two phones in the bedroom, a laptop, an iPad, a hard drive, and several flash drives from the residence. Detective Host and other officers then accompanied Defendant to the MAC to retrieve the video camera and memory card. The vibrator was later sent to the Tennessee Bureau of Investigation ("TBI") laboratory for DNA testing. Detective Host also collected a DNA sample from the victim and sent it to the laboratory. Detective Host was unable to verify that Defendant was enrolled as a student in any massage training courses.

The victim later, on July 28, 2021, notified Detective Host that she had also received two direct messages from Defendant through Instagram which she had not noticed earlier. Detective Host took screenshots of the messages and obtained another search warrant to conduct a forensic analysis on the electronics seized from Defendant's residence.

TBI Special Agent Alyssa Manfredi performed a DNA analysis on the vibrator and storage bag, and the victim's DNA swabs. She testified that the handle of the vibrator contained DNA from an "unknown male" as the major contributor. The shaft of the vibrator contained DNA from at least two individuals, including an unknown male. The victim was excluded as a contributor to the major profile. Special Agent Manfredi further testified that "[d]ue to the limited minor contributor profile obtained, the minor contributor profile is inconclusive for comparison purposes." She agreed that she was unable to determine whether the victim was the other person on the DNA profile from the vibrator. She agreed that cleaning the vibrator may impact the amount of DNA.

MPD Detective Tyler Smith,[4] an expert in digital forensics, performed an analysis on two flash drives, three SD cards, a laptop, a hard drive, and a Canon PowerShot camera recovered from Defendant's residence to look for a video of the offense. Another detective examined the cell phones recovered from the residence. Detective Smith did not recover anything from the camera itself because it had no internal memory. When examining the other devices, he initially did not find the video. He testified:

> However, whenever I was reviewing the timeline and all attached devices in this case, I saw that during the time of the sexual assault, the rape, I saw that a flash drive had been inserted into the computer.
>
> And I doublechecked that flash drive to make sure that I hadn't missed any images or video on that flash drive.
>
> So that kind of gave me a clue that - - you know, had I missed it during the initial process using Griffeye, I wanted to go back and be double certain that the video did not exist on the flash drive, itself.
>
> Because I saw some remnants of videos on the SD card. This item number four, I saw some videos had been made and deleted. But I didn't find the video, itself, using all those recovery tools.
>
> And so I knew that it most likely had been deleted. But I wanted to ensure I knew where it went.
>
> And there was no sign of it on the computer. But once I saw that there was a registry entry for a USB drive that had been inserted into the device about the same time a video was taken, then it became of interest. I went back

---

[4] At the time of trial, Mr. Smith was employed by the United States Secret Service as a Network Intrusion Forensics Analyst.

and double checked and found the video stored on the flash drive, which is item number SW01.

The video from the flash drive was named "MVI2830." Detective Smith noted that he also found "remnants of the video" on the SD card that was in the camera, but he was unable to play the video because it had been deleted from the card. He deduced that the video was copied from the SD card to the flash-drive using the laptop. The video was not on the hard drive of the computer. The video was created at "7:57:46 p.m. central daylight time on July 25th, 2021." Detective Smith noted that the sound quality of the video was not good, and he attempted to enhance it.

Sixteen minutes of the nineteen-minute video was then played for the jury. The video showed a pallet on the floor in a dimly lit room with soft music playing in the background. Defendant applied oil to the victim's legs and told her, "You can just go to sleep." He then began massaging the backs of the victim's thighs and applying pressure to the backs of her thighs and buttocks. Defendant eventually spread the victim's legs apart and moved his hand to her vagina outside of her swimsuit bottom. When he began removing her swimsuit bottom, the victim brought her legs together. She giggled a bit as Defendant struggled to get her bikini bottom past her knees. The victim then pulled the sheet over her bottom, clenched her legs, and held one side in place with her fingers.

Defendant touched the victim's buttocks and outside of her vagina. He also retrieved a pink vibrator which he referred to as a "massage stick." He lubricated the vibrator and rubbed it on the victim's legs, vaginal area, and buttocks, predominately rubbing and penetrating her vaginal area asking if it felt good. Defendant directed the victim to turn over but she refused and asked him to press down on her back. Defendant said, "Let's stay this way." While the vibrator was still inserted in the victim's vagina, Defendant said, "This is supposed to release all the tension." He then licked his fingers and inserted them into her vagina. Defendant asked questions about the victim's menstrual period, which she had started the day before, and about her sexual experiences such as whether she rubbed herself. He also asked if she had experienced an orgasm to which the victim replied, "No[,]" and Defendant said, "Wow." While Defendant's fingers were inserted in the victim's vagina, he asked if it felt good, and the victim responded affirmatively. Defendant then said, "Okay. Supposed to."

The victim eventually complied with Defendant's request to turn onto her back, and she crossed her legs and clasped her thighs together. Defendant continued to penetrate her vagina with his fingers. He also licked his fingers and poured oil directly onto her vagina. Defendant again asked the victim if it felt good, and she responded affirmatively. He then said that "it's about to feel real [sic] good." The victim slightly giggled and said, "sorry." Defendant told the victim that he was trying to get her to

- 9 -

"release," and she again giggled a bit and suggested that she could not because she was on her period. Defendant asked her to take out her tampon, but she refused. He said, "I'll see if I can help [you]." He then spread her legs and performed cunnilingus on her.

Based on the above evidence, the jury convicted Defendant as charged of four counts of rape by fraud and four counts of rape without consent.

The presentence report and addenda were made an exhibit at the sentencing hearing. Detective Tyler Smith testified that there were some additional charges that were redacted from the original indictment and his report in this case. A copy of his unredacted report was then admitted as an exhibit. Detective Smith testified that he found images of child pornography and "just other suspicious imagery of young teenage females" on the "hard-drives and jump drives" recovered from Defendant's residence. One photograph depicted a "prepubescent female that was undressed from the waist down being sexually abused" by an adult male. Other photographs showed young females in various states of undress. Detective Smith noted that one file was titled "nudist young females." He further testified: "In addition to some pictures that appear to be made on a boat. And it was females who - - it appeared that their swimsuit had fallen off. And they were some really close-up pictures of the state of undress and repair of the swimsuit issue."

Detective Smith testified that from Defendant's computer hard-drive he recovered numerous videos of another unidentified female; the videos appeared to have been taken underneath a sheet while the female was asleep. He said, "And they were being penetrated by the same sex toy that was used in this rape that was of [the victim]." When asked about similarities with this case, Detective Smith testified:

> There [were] a lot of similarities with it. The victim or person in both videos were both lying flat on their stomach[s]. They were both motion-less; possibly asleep. There were a whole lot of similarities in the videos that I observed that were taken with the - - the pink vibrator, prior to this - - the rape, there are a lot of similarities to the rape video, itself.

Detective Smith testified that there were additional images of child pornography recovered from a cell phone examined by Detective Jennifer West. There were the same or similar videos of the pink vibrator being used to penetrate another female. Detective Smith testified that there were also videos of small children, that "may or may not" have been related to Defendant, undressed in a bathtub and "another photograph in various states of undress of that same female."

R.A., the victim's older sister, read her victim impact statement to the trial court. She was sixteen years old when the victim was born, and she had always helped take care of the victim and the victim's twin brother. R.A. testified that Defendant and Mrs. Canada had been her family's neighbors for many years and first met the victim when she was "very little[.]" They would occasionally pay the victim and her twin brother to "watch their home, water their plants, or even take care of their dog[.]" R.A. said that her family interacted with Mrs. Canada more than Defendant, and Mrs. Canada sometimes watched their home when they went out of town. They also had many conversations with Mrs. Canada, and she had invited them inside her home to give them tours of finished remodeling projects. R.A. testified that they saw Defendant when her family "solicited their home, as children will do, for school fundraisers or even on Halloween." The only other times they saw him were when he mowed the lawn or washed his car. R.A. said that Defendant was not as friendly as Mrs. Canada, "which we overlooked because [Mrs. Canada] was such a social butterfly." She thought Defendant and Mrs. Canada were "good neighbors, who genuinely cared about our family." R.A. testified that C.L. blamed herself for what happened to the victim and could not talk about the incident without "breaking down in tears."

R.A. told the trial court that she and C.L. had "gone through great lengths" to help the victim "process through what happened, and to help her feel safe." C.L. also tried to help the victim by getting her in to see doctors and therapists, which was expensive. R.A. testified that the victim was diagnosed with PTSD and had very low self-esteem. She felt that the rape "has affected [the victim's] relationship with other men, and any [prospective] romantic relationship." The victim also had panic attacks, and the rape affected her schoolwork and jobs. R.A. and C.L. both sold their homes so they could all live together in a new city.

C.L. also read her victim impact statement to the trial court. She noted that Defendant and Mrs. Canada had known her family for over twenty years as neighbors, and they helped each other out when in need. She trusted them and never suspected that Defendant was a "predator." Mrs. Canada never gave her "any indication that her husband was not safe to be around." C.L. testified that the victim began having panic attacks after the rape and would not come home if Defendant or Mrs. Canada were out in the yard. The victim would also call and ask C.L. to check the yard to see if they were outside. C.L. said that the victim began seeing a mental health therapist soon after the assault, had been in therapy for two years, and will continue therapy for as long as necessary. She noticed that the victim also had "lower self[-]esteem; less confidence; and distrust of people." C.L. further testified: "After the attack, [the victim] missed two weeks of work. She continues to have panic attacks, especially, if she sees someone who looks like [Defendant]. And she has been diagnosed with PTSD." C.L. testified that she moved to another house because it "became too difficult to see the place on a daily basis,

where my daughter's nightmare began." She stated that Defendant stalked the victim and "lured her to his house under false pretenses. He is a predator." She asked for the trial court to impose the maximum sentence.

Meabh Bullard, the assistant victim/witness coordinator for the district attorney general's office, read the victim's impact statement to the trial court. In her statement, the victim indicated that her life had not been the same since the assault, and she felt "violated and misused." The victim said, "There has not been one day that I don't think about what happened. As a young woman, I put my trust in someone I had known for years, who I never expected to take advantage of me." She also had changes in her behavior and her mood that worsened over time. The victim said that she later returned to college and work, but "[w]ork eventually consumed [her]." She could not concentrate or focus on school and struggled "mentally and financially." Her grades dropped, and she lost academic scholarships. The victim stated that she also began mental health counseling because of the attack and would continue counseling until she felt better. She noted that she had struggled with PTSD, depression, and anxiety, which had been challenging.

Sumner Bouldin, an attorney in Rutherford County, testified that he had known Defendant since the late eighties "initially through the pay center facility that he ran, and I was a member of. And then subsequent facilities after that." Mr. Bouldin testified that he and Defendant became friends, and they ran and rode bikes together. He also knew Defendant's family. Mr. Bouldin testified that Defendant was an outgoing, friendly, and helpful person, and he did not experience anything that would cause him not to trust Defendant. He had not been present at trial and had no "particular opinion about what occurred at trial, but thought it was a "very unfortunate situation." However, the incident did not change his opinion of Defendant. He and Defendant never discussed the details of what happened. When asked if Defendant's possession of child pornography changed his opinion of Defendant, Mr. Bouldin replied: "No. Not in the sense that I - - over the course of decades he's been a friend and a valued member of the community. And that's how I know him. So I don't know what else I can say."

Dr. Robert Dray, a surgical urologist, testified that he had known Defendant since 1985. Defendant was the director of the hospital's exercise and wellness facility, "called the pay center." They ended up exercising and spending a lot of time together and became "very, very close friends together." Dr. Dray and his wife were also godparents to Defendant's youngest daughter. He said that Defendant was good at encouraging others, and he had not observed any concerning behavior from Defendant. He noted that Defendant was sought out as a public speaker "in town over rotary clubs, and Nissan Manufacturing Company asked him to put together an exercise program for them. He was trusted." Dr. Dray described Defendant as "really a civic treasure in this

community." Dr. Dray was aware of Defendant's convictions but did not attend the trial. This did not change his opinion of Defendant although he did not condone "the behavior" for which Defendant was convicted.

On cross-examination, Dr. Dray testified that he and Defendant had discussed the case, and Defendant "thought he did something wrong. And he was really, really sad and sorry about it." Dr. Dray testified that "[p]eople can get off the tracks. But he has a track he can get back on. And we have seen it. We know what it was." He said that raping a young girl is "way off the tracks."

Defendant's daughter, Dr. Sarah Canada, testified that Defendant was a great father who attended every dinner and school function. She said he was "ever-present in our lives" and asked the trial court to consider leniency because of Defendant's age. Dr. Canada feared that a "harsh sentence would certainly mean his death in prison."

Defendant gave an allocution during which he quoted scripture and asked for leniency and mercy. He also said he was very sorry and remorseful and noted that he had "progressively debilitating Parkinson's disease." Defendant pointed out that he had never been in trouble, broken the law, gotten a traffic ticket, or been arrested. He noted that he was a "true first offender." Defendant told the court that he and his wife had been married for forty-three years, and he was the father of three children and grandfather of three. Defendant said that he nearly died in jail due to the lack of proper medical care, and he had lost his reputation, which he worked "a lifetime to achieve." He further said that he had spent ten weeks in jail and that he would not survive another ten weeks because "[t[here's only so much mental and physical abuse a person can tolerate."

Defendant said that the symptoms of his Parkinson's disease had "increased greatly" while incarcerated, and he was unable to celebrate holidays and special occasions due to his incarceration. Defendant pondered as to whether the new medication that he began taking for his Parkinson's disease caused his actions in this case. However, Defendant said that "in the end, I must take responsibility for my actions and ask all for forgiveness." Defendant told the trial court that if granted probation, he could properly treat his Parkinson's disease, pay any monetary restitution, and do volunteer work at jail and at church. He would also continue receiving his monthly Social Security check which would allow him and his wife to continue living in their home. Defendant said that he would continue living as a model citizen if released and meet or exceed all the court's requirements.

In determining the appropriate sentence, the trial court considered the evidence presented at trial and the sentencing hearing, the presentence report, the sentencing alternatives, the nature and characteristics of the criminal conduct involved, the

enhancement and mitigating factors, and the statistical information provided by the Administrative Office of the Courts "for sentencing practice similar to this offense." The trial court noted that it also listened to Defendant's allocution and statements made on his behalf and his potential for rehabilitation and treatment.

The parties agreed that Defendant was a Range I offender and subject to a sentencing range of eight to twelve years for the Class B felony of rape. Because the offenses were committed on July 25, 2021, the sentence was subject to service at one hundred percent. The trial court applied three enhancement factors: Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; the offense was committed to gratify Defendant's desire for pleasure or excitement; and that Defendant abused a position of private trust. T.C.A. § 40-35-114 (1), (7), and (14). As a mitigating factor, the trial court considered the absence of serious bodily injury, although the court noted the victim's mental anguish and suffering. *Id.* § 40-35-113 (1).

In support of enhancement factor one, the trial court found that the State had proven by a preponderance of the evidence that Defendant possessed child pornography. Defendant had a photo on his laptop of a prepubescent female engaged in sexual activity with an adult male. The trial court also noted that Defendant "certainly" had "other photos of young girls."

As for enhancement factor seven, the trial court found the video recording Defendant made of the offenses made it "plainly" apparent that he assaulted the victim for pleasure and excitement. The court further pointed out that Defendant invited the victim to his house while his wife was away under the pretense of giving her a massage for a class project. While there, Defendant "penetrated her on four different occasions in various ways." He appeared "excited and aroused" in the video, his breathing was labored, and he used his mouth, fingers, and a vibrator to penetrate the victim. Defendant also asked the victim "about having an orgasm[.]"

In support of enhancement factor fourteen, the trial court found that the victim had lived across the street from Defendant since she was a "very young child." The court further observed that the victim's family was "much more than acquaintances" with Defendant and his wife. The court noted that the victim did homework at Defendant's house, and the families cared for each other's houses while on vacation. The court further found that the victim trusted Defendant who was a "man she had known all her life."

- 14 -

In denying application of mitigating factor eleven, the trial court found that "[t]his was a planned event, where [Defendant] sought to use his relationship with the victim to lure her to his home to commit this heinous crime."  The trial court further pointed out:

> I don't believe this event was a one-time event.  The Court had already found that the State has shown by a preponderance of the evidence that he -- that on his computer there was child pornography, similar videos of another unidentified female, where he use[d] the same vibrator.

After considering the applicable enhancement and mitigating factors, the trial court compared Defendant's allocution with his written statement and found that they were "certainly in contrast[.]"  When giving his version of events for purposes of the presentence report, Defendant wrote: "I offered to give a massage, consent form was signed."  The court found that the statement "certainly did not reflect a man who was remorseful, a man that accepts responsibility for his actions."

The trial court weighed the applicable factors and found that the three enhancement factors "far" outweighed the one mitigating factor.  The court merged Defendant's convictions of rape by fraud with his convictions for rape without consent and imposed an effective sentence of eleven years in confinement followed by community supervision for life.  Defendant was also ordered to register as a sex offender.

**Analysis**

On appeal, Defendant argues that the evidence was insufficient to support his eight convictions for rape and that the trial court abused its discretion by imposing an effective eleven-year sentence for his convictions.

## I. Sufficiency of the Evidence

Defendant contends that the evidence fails to show that the rape was accomplished by fraud or without the victim's consent.  The State responds that the evidence was sufficient for a rational juror to have found Defendant guilty of rape by either theory.

When evaluating the sufficiency of evidence on appeal, the relevant question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence presented at trial and to all reasonable and legitimate inferences that may be drawn from the evidence.  *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016).  This court will not reweigh or reevaluate the

evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Davis*, 466 S.W.3d 49, 70 (Tenn. 2015). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the burden of demonstrating that the evidence is insufficient to support the conviction is on the defendant. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In *Dorantes*, our supreme court held that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id.* at 381.

As applicable to this case, rape is the "unlawful sexual penetration of a victim by the defendant," if either the "sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]" The term "sexual penetration" means "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body." T.C.A. § 39-13-501(7). Consent is not effective when "[i]nduced by deception or coercion." *Id.* § 39-11-106(a)(11)(A).

To support a conviction for rape by fraud, the State was required to prove that the sexual penetration was accomplished by fraud. *Id.* § 39-13-503(a)(4). "'Fraud' means as used in normal parlance and includes, but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of this title." *Id.* § 39-11-106(a)(15). This court has held that a person commits rape by fraud

> when he or she engages in sexual penetration that is accomplished by fraud. The fraudulent conduct could have included trickery, subterfuge, or some other misrepresentation by the [accused] that gave the victim[ ] a false impression and allowed or aided [the accused] in the accomplishment of the sexual penetration.

- 16 -

*State v. Mitchell*, No. M1996-00008-CCA-R3-CD, 1999 WL 559930, at *6 (Tenn. Crim. App. July 30, 1999). "The fraud may go directly to the sexual penetration itself, or may relate to the inducement of the sexual act." *Id.* (citing T.C.A. § 39-11-106(a)(9)(A); *State v. Tizard*, 897 S.W.2d 732, 741-42 (Tenn. Crim. App. 1994)). This court has affirmed convictions of rape by fraud where a defendant told the fourteen-year-old victim "that she needed to have sex with him to grant him sufficient [magical] power to heal her mother and [sister] after they had surgery [and that] otherwise they would be crippled or die" and also promised that he could give the victim "magic powers through sex." *State v. Enrique, Sr.*, No. M2009-02319-CCA-R3-CD, 2011 WL 4529643, at *16 (Tenn. Crim. App. Sept. 29, 2011); *see also State v. Batts*, No. M2001-00896-CCA-R3-CD, 2002 WL 31039378, at *3 (Tenn. Crim. App. Sept. 11, 2002) (finding that evidence was sufficient for rape by fraud when defendant posed as a security guard).

When viewed in the light most favorable to the State, the proof shows that Defendant called C.L. under the pretense of needing to interview a college student for a massage class he was taking. C.L. said Defendant sounded desperate. When C.L. gave the phone to the victim, Defendant told her he needed someone to help him with a questionnaire for a class project because another girl had dropped out. He directed her to wear a bathing suit bottom because he would be touching her knees and elbows; he also mentioned that she should wear a sports bra. At that point, Defendant did not tell the victim he needed her help for a massage. The victim then left her house wearing a sports bra, bikini bottom, t-shirt, and shorts.

When the victim arrived at Defendant's house, he walked her inside, and she sat down on the couch while he sat in a chair across from her. He had created a spa-like atmosphere in the living room with candles and soft music playing. There was a pallet on the floor with sheets, pillows, and an anatomy book. Defendant asked the victim questions and he took notes. He asked if she had previously had a massage, and she said no. He also asked about her hobbies and any previous injuries. Although the victim felt uncomfortable, she trusted Defendant and stayed. He then instructed her to get undressed but to leave on her undergarments and lie down on the pallet under a sheet, and he left the room. The victim expected Defendant to touch only her arms and legs which were visible. She believed that this was part of Defendant's class project. He told her that the session would be recorded.

Defendant began what appeared to be a massage by applying oil to his hands and massaging the victim's legs. He then focused on her upper thighs and buttocks. Defendant eventually spread the victim's legs apart and placed his hand on the outside of her vagina and then removed her bikini bottom placing his hand and fingers in her vagina. He also performed cunnilingus on her. At one point Defendant asked the victim to remove her tampon, but she refused. Defendant continued the ruse that he was

- 17 -

performing a massage by retrieving a pink vibrator he referred to as a "massage stick" which he inserted in the victim's vagina stating that it was "supposed to release all the tension." Later he again said that he was trying to get her to "release" and to close her eyes. After the incident was over, Defendant continued the ruse by leaving a business card on the victim's clothing and telling her to drink plenty of water and to let him know if she later had any pain or bruising. The jury accredited the victim's testimony that Defendant made the entire incident seem like a massage and that he never mentioned anything sexual between them. She said that she "felt kind of violated" after the incident and did not feel like she just had a massage. The victim admitted she was aware that private areas were not usually included in a massage but because of her inexperience, she called Ms. Sanders who confirmed that massages do not involve the touching of intimate parts.

Regarding the four convictions for rape without consent, we acknowledge that based on the victim's trial testimony and the video, the victim did not object to the sexual penetration by Defendant or tell him to stop. However, any tacit consent was not effective because it was induced by Defendant's deception. *See* T.C.A. § 39-11-106(a)(11)(A); *Batts*, 2002 WL 31039378, at \*3.[5] Furthermore, although the victim was not threatened or restrained and could have left Defendant's house, she testified that Defendant had "more authority" over her and she was "always taught to, like when someone is older than you tells you what to do, you listen to them."

Based on this evidence, a jury could reasonably conclude that the rape in this case was accomplished by fraud and without the victim's consent. Defendant is not entitled to relief.

## II. Sentencing

Defendant argues that the trial court abused its discretion by imposing an effective eleven-year sentence for his convictions by improperly applying two enhancement factors to his sentence and failing to consider an additional mitigating factor. The State asserts that the sentence is proper.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion

---

[5] This definition was included in the jury instructions.

- 18 -

when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

Once a trial court determines the appropriate range of punishment, the trial court must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) any arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any applicable mitigating and enhancement factors; (6) any statement the defendant makes on his behalf; (7) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (8) the result of the validated risk and needs assessment. T.C.A. § 40-35-210(a), (b). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4).

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *perm. app. denied* (Tenn. July 18, 2024). It is within the trial court's sound discretion to weigh any applicable mitigating or enhancement factors. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008)), *no perm. app. filed.* It is well-settled that "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal" since the 2005 amendments to the Sentencing Act. *Bise*, 380 S.W.3d at 706; *see State v. Barnes*, No. M2024-00016-CCA-R3-CD, 2025 WL 25896, at *11 (Tenn. Crim. App. Jan. 3, 2025), *perm app. denied* (Tenn. May 23, 2025).

Here, the trial court found that Defendant was a Range I, standard offender. *See* T.C.A. § 40-35-105. The trial court imposed within-range sentences for each conviction. *See id.* § -112(a)(2) (mandating that a Range I sentence be between eight and twelve years for a Class B felony). As noted above, the trial court applied three enhancement factors: Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; the offense was committed to gratify Defendant's desire for pleasure or excitement; and that Defendant abused a position of private trust. *Id.* § 40-35-114 (1), (7), and (14). As a mitigating factor, the trial court considered the absence of serious bodily injury, although the court noted the victim's mental anguish and suffering. *Id.* § 40-35-113 (1).

Defendant contends that the trial court improperly imposed enhancement factors one and fourteen and that the court erred by failing to consider as a mitigating factor that he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct. *Id.* § 40-35-113 (11).

Defendant does not contest application of factor seven, and the record reflects that it was appropriately applied. As for factor one, Defendant's history of other criminal behavior, the trial court did not abuse its discretion in applying this factor based on the child pornography discovered on Defendant's laptop and cell phone. One of the pictures of child pornography on Defendant's laptop consisted of a "prepubescent female that was undressed from the waist down being sexually abused" by an adult male. Detective Smith testified that while he did not analyze the cell phones recovered from Defendant's residence, he learned that there were additional images of child pornography found on those devices. The trial court noted that while Defendant had "other photos of young girls," this was not the basis for application of factor one.

As to enhancement factor fourteen, we conclude that the trial court erred by finding that Defendant abused a position of private trust. "[A]pplication of the factor requires a finding, first, that defendant occupied a position of trust" and then a determination of "whether the position occupied was abused by the commission of the offense." *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). The position of private trust is dependent on the nature of the relationship, not on the formality, and our supreme court has noted that the positions of "parent, step-parent, babysitter, teacher, [and] coach" are a few "obvious examples." *Id.* In *State v. Stepp*, a panel of this court held that "[t]he mere existence of a friendship ... does not establish 'private trust.'" No. E2005-02178-CCA-R3-CD, 2006 WL 3102353, at *5 (Tenn. Crim. App. Nov. 2, 2006); *see also State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (holding that a 'live-in' relationship, where two people live together as man and wife, does not establish a 'private trust'). Similarly, the mere relationship of being a "neighbor" is insufficient to support a finding of private trust. *State v. Forss*, No. E2007-01349-CCA-R3-CD, 2008 WL 253541, at *4 (Tenn. Crim. App. Jan. 30, 2008).

In this case the proof shows that while Defendant and his wife had been longtime neighbors of the victim and her family, the relationship did not extend to a position of private trust. C.L. and Mrs. Canada took care of each other's plants and pets while on vacation, and Mrs. Canada occasionally invited C.L. over for supper and had brought food when she was ill. Mrs. Canada later hired the victim to house sit when she and Defendant were out of town; C.L. and the victim only spoke with Mrs. Canada to set up the arrangements. They both testified that they considered Defendant a neighbor and had limited interactions with him although the victim had known Defendant since she was young, and she and her brother had worked on class projects once or twice at his house.

The victim had never been alone in the house with Defendant before the offenses in this case occurred. The facts do not support that Defendant was in a position of private trust.

Finally, Defendant argues that the trial court erred by failing to consider as a mitigating factor that he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct. T.C.A. § 40-35-113 (11). In denying application of this factor, the trial court found that "[t]his was a planned event, where [Defendant] sought to use his relationship with the victim to lure her to his home to commit this heinous crime." The court further said that it did not "believe this event was a one-time event. The Court had already found that the State has shown by a preponderance of the evidence that . . . on his computer there w[ere] . . . similar videos of another unidentified female, where he used the same vibrator." While Detective Smith acknowledged he did not know the identity of the female in the video or whether it was a non-consensual sexual activity, this video, along with the other images found on Defendant's electronic devices and Defendant's extensive planning in this case, was sufficient for the trial court to conclude that this was not a "one-time event" in Defendant's life and to deny application of factor eleven.

Even though we have determined that the trial court erred in the application factor fourteen, the court properly applied two other enhancement factors, one of which Defendant does not challenge. *See State v. Ambrose*, No. M2023-00097-CCA-R3-CD, 2024 WL 3596231, at *10 (Tenn. Crim. App. July 31, 2024) (citing *State v. Dotson*, 450 S.W.3d 1, 103 (Tenn. 2014)) (noting that "the application of a single enhancement factor supports an enhanced sentence"), *perm. app. denied* (Tenn. Feb. 20, 2025). Additionally, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the Sentencing Act. *Bise*, 380 S.W.3d at 706. There is nothing in the record indicating that the trial court in this case departed from the Sentencing Act. The trial court properly exercised its discretion in imposing a within-range sentence of eleven years. Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

s/*Jill Bartee Ayers*

JILL BARTEE AYERS, JUDGE